Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/08/2016 09:06 AM CDT

DEAN P. MARTIN, APPELLEE, V.
RHONDA J. MARTIN, NOW KNOWN AS
RHONDA J. BROWN, APPELLANT.
___ N.W.2d ___

Filed July 8, 2016.    No. S-15-672.

1. **Contempt: Appeal and Error.** In a civil contempt proceeding where
a party seeks remedial relief for an alleged violation of a court order,
an appellate court employs a three-part standard of review in which (1)
the trial court's resolution of issues of law is reviewed de novo, (2) the
trial court's factual findings are reviewed for clear error, and (3) the trial
court's determinations of whether a party is in contempt and of the sanc-
tion to be imposed is reviewed for abuse of discretion.

2. **Contempt.** Civil contempt proceedings are instituted to preserve and
enforce the rights of private parties to a suit when a party fails to com-
ply with a court order made for the benefit of the opposing party.

3. **Contempt: Words and Phrases.** Willful disobedience is an essential
element of contempt; "willful" means the violation was committed
intentionally, with knowledge that the act violated the court order.

4. **Contempt: Presumptions: Proof.** Outside of statutory procedures
imposing a different standard or an evidentiary presumption, all ele-
ments of contempt must be proved by the complainant by clear and
convincing evidence.

5. **Contempt.** Contempt proceedings may both compel obedience to orders
and administer the remedies to which a court has found the parties to
be entitled.

6. **Courts: Jurisdiction: Divorce: Contempt.** A court's continuing juris-
diction over a dissolution decree includes the power to provide equi-
table relief in a contempt proceeding.

7. **Courts: Equity.** Where a situation exists that is contrary to the prin-
ciples of equity and which can be redressed within the scope of judicial
action, a court of equity will devise a remedy to meet the situation.

8. **Contempt: Sentences.** A civil sanction is coercive and remedial; the contemnors carry the keys of their jail cells in their own pockets, because the sentence is conditioned upon continued noncompliance and is subject to mitigation through compliance.

Appeal from the District Court for Lancaster County: Steven D. Burns, Judge. Affirmed.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

Corey J. Wasserburger, of Johnson, Flodman, Guenzel & Widger, for appellee.

Heavican, C.J., Wright, Connolly, Miller-Lerman, Cassel, Stacy, and Kelch, JJ.

Kelch, J.

## I. INTRODUCTION

This is an appeal from an order of the district court for Lancaster County that found Rhonda J. Martin, now known as Rhonda J. Brown, in contempt of court for willfully violating the parenting provisions of her marital dissolution decree and imposed sanctions. For the reasons set forth below, we affirm.

## II. BACKGROUND

Rhonda and Dean P. Martin were divorced in 2002. They share legal custody of their two minor children, Taylor and Ethan Martin. Initially, Rhonda and Dean shared equal physical custody of the boys; but in 2008, the decree was modified to the effect that Rhonda now has physical custody of the boys and Dean has rights of visitation. Dean's visitation rights were modified by a parenting plan entered into by the parties; the plan was approved by the district court in December 2011.

Pursuant to the 2011 parenting plan, Dean was to have the boys every other weekend from 5 p.m. on Friday to 7 p.m. on Sunday, for 6 weeks during the summer, and on certain holidays. In 2014, it was Dean's year to have the boys for

Christmas and his parenting time was to begin at 6 p.m. on December 19 and end at 12 p.m. on December 27.

As for transportation, Dean was to pick up the boys at the start of his parenting time from Rhonda's home in Prague, Nebraska, and Rhonda was to pick them up from Dean's home in Lincoln, Nebraska, at the conclusion of Dean's parenting time. Previously, Rhonda had taken the boys to Dean's home and he had returned them to Rhonda's home; however, Dean requested the new arrangement because Taylor's involvement in sports required Taylor to be in Prague on Friday nights and Rhonda had taken the position that she was not responsible for transporting Taylor to Dean if his sporting events went past 5 p.m. On such occasions, Rhonda would sometimes deliver Ethan to Dean at 5 p.m. and Dean would drive to Prague to retrieve Taylor after his sporting events.

On April 3, 2015, Dean filed a motion for an order for Rhonda to show cause why she should not be held in contempt for her alleged failure to allow Dean to exercise parenting time on the following days: (a) during the weekend of December 12, 2014; (b) from December 19 to 24; (c) on January 9, 2015 (with Ethan); (d) on January 23; (e) on March 6; and (f) on March 20 and 21. At the time Dean filed the motion, the boys, Taylor and Ethan, were 16 and 15 years old, respectively.

### 1. June 11, 2015, Hearing

A hearing on Dean's motion was held on June 11, 2015. Both Rhonda and Dean testified, and various exhibits were offered and received. Much of the evidence in this case is in the form of text messages sent back and forth between the parties and their children. We reproduce the messages in their original form.

### (a) Weekend of December 12, 2014

Under the parenting plan, Dean was to have the boys on the weekend of December 12, 2014. Taylor had a basketball

game that Saturday and sent Dean several text messages on December 12 expressing his desire to travel with his team the next day.

Dean arrived at Rhonda's house at 5 p.m. that night to retrieve the boys. The boys went outside with their bags and approached Dean's vehicle. Taylor got into Dean's vehicle, but Ethan did not. Ethan refused to get in the vehicle and returned to the house. Taylor stayed in the vehicle and talked to Dean for a few minutes before returning to the house. Rhonda testified that Taylor told her that Dean wanted to know whether it was fine if the boys stayed home that weekend. Rhonda testified that she told Ethan that she was "'not gonna shut [her] door'" on them, but that it was up to Dean whether the boys went with him or stayed with her. According to Dean's testimony, Taylor told him that Rhonda said the boys could stay with her and that they did not have to go with Dean. Dean left without the boys.

Dean testified that sometime after he left, he received a telephone call from Ethan and eventually spoke with Rhonda about what had happened. Dean testified that Rhonda asked him, "'Why'd you leave? It's your parenting time. I'm kind of surprised. The boys came back in and I had no idea if there was an issue of any kind.'"

Further, Rhonda testified, "Physically, there [was] no way that I could grab [Ethan] and shove him into the car and force him to go."

### (b) December 19 to 24, 2014

Dean was supposed to have the children from 6 p.m. on December 19, 2014, until 12 p.m. on December 27. On December 18, Taylor sent Dean the following text message in the afternoon:

Hey I got my drivers license today for my 16th birthday. You don't have to come get us this weekend because we would like to stay home until the 24th. I can drive to ur house then, but we would like to come on the 24th by

noon, stay on Christmas, and then go home on the 26th at 3:30. Please Let us know.

    4:09 PM

Without responding to Taylor, Dean forwarded the text message to Rhonda and asked whether she was going to tell Taylor and Ethan that they needed to go with him on December 19, 2014. Rhonda responded to Dean, "I've encouraged them to do so, but it sounds like they told you what they want."

Sometime later, Rhonda sent a text message to Dean asking if everything was worked out in terms of his parenting time. Dean replied that it was all worked out and that he would retrieve the boys from their grandparents on December 24, 2014. The boys went to Dean's house on December 24 and stayed until December 26.

### (c) January 9, 2015

Dean was supposed to have the boys over the weekend of January 9, 2015. Taylor had a basketball game that Friday, and Dean made arrangements to pick Taylor up after his game. As for Ethan, Dean drove to Rhonda's house to pick him up at 5 p.m. However, Ethan refused to go with Dean.

At that time, Rhonda was in Missouri for a National Guard drill. Dean called Rhonda and told her that Ethan was refusing to get in his vehicle, and he asked Rhonda for help. Rhonda testified that the telephone was put on the speakerphone setting and that on speakerphone, she told Ethan that Dean had been waiting 2 weeks to see him and that he needed to go spend time with Dean. Rhonda testified that Ethan said he did not want to go with Dean to Taylor's game; Dean testified that Ethan wanted to stay at Rhonda's house and play video games.

Rhonda testified that she told Dean she would do whatever he needed her to do, but that she was "almost 200 miles away" and that there was "not a lot" she could do except talk to Ethan. While still on speakerphone, Dean advised Rhonda that she needed to punish Ethan by taking things away from him

or "ground[ing]" him. Rhonda testified that she told Dean that would be a conversation she would have to have with Ethan in the future.

Rhonda ended the conversation with the belief that Dean would continue to talk to Ethan. Before the call ended, she told Dean she would contact him or that he could call her back. Rhonda testified that she called Dean back within 30 minutes and that Dean told her he had left Ethan at home. Rhonda testified that Dean said he was not going to fight with Ethan on the matter and that Ethan needed to be at his home by 10 a.m. the following day. Rhonda's husband transported Ethan to Dean's home the next morning.

Dean testified that he did not force Ethan to go with him that Friday or tell Ethan that he had to go with him. Instead, Dean testified that he expected Rhonda would do that. When asked whether Rhonda told Ethan he should go, Dean agreed that she did, but Dean testified that Rhonda also told Ethan it was up to Ethan and suggested that Rhonda's husband could take him to Dean's home the next day.

### (d) January 23, 2015

Dean's next parenting time was to occur over the weekend of January 23, 2015. Taylor had a basketball game in Palmyra, Nebraska, on Friday and another game in Brainard, Nebraska, on Saturday. On January 21, Taylor sent Dean the following text messages:

> Hey dad I'm just going to stay home this weekend. I am going to be busy this weekend and I just want to stay home. I'm going to have some people from the basketball team over after Saturday's game too.
> 7:03 PM
> Actually can we just go to ur house with you after my game on Saturday[.]
> 7:14 PM

Rhonda testified that she communicated with Taylor about whether he and Ethan would go to Dean's house that weekend.

According to Rhonda, she told Taylor that the decision was ultimately up to Dean and that Taylor needed to communicate with Dean about it, because it was Dean's weekend and she did not have any bearing on the decision. Later, Rhonda texted Taylor in relevant part: "Ok. Do not respond. I'm trying to take care of this. Just stand your ground when he approaches you." Rhonda testified that she meant that "Taylor didn't need to get into the middle of what was going on between myself and Dean at the time . . . as far as giving out phone numbers because he didn't have permission."

Rhonda testified that on Friday, the night of the Palmyra game, the boys' belongings were in her vehicle so the boys could go with Dean that evening. She testified that toward the end of the junior varsity game, the boys approached her and told her they did not want to go. Rhonda testified that she told the boys that it was Dean's decision and that she would not get in the middle of it. According to Rhonda, she later learned from the boys that Dean told them it was fine for them not to go with him that evening and that Dean would transport them to his house after the basketball game the next day. The boys did not go with Dean that night, but instead went with Dean after the basketball game on Saturday.

Further, the transcript of text messages that Rhonda prepared and offered at the contempt hearing did not include her message to Taylor encouraging him to "stand his ground" and not respond to Dean.

On January 29, 2015, Dean sent an e-mail to Rhonda, expressing his discontent about not receiving his parenting time:

> Rhonda
>
> I want you to know that I was not ok with the boys not coming AGAIN Friday 1/23/15 to our home for my scheduled parenting time.
>
> Just to let you know I am never ok with Taylor & Ethan not coming on my time frames. I am sending you this email so you know that if the boys say it is ok with

Dad if we do not come, I AM NOT OK WITH THAT! And also I have NEVER told the boys it is ok not to come on my time frame.

You will need to contact me if they say that and discuss, and not ASSUME it is ok. I want you to contact me and not go through our boys and have them tell me they are not coming my time frames, you are the parent and they are the children. I hope this will stop any confusion with this issue.

### (e) March 6, 2015

Under the parenting agreement, Dean was supposed to have the boys on the weekend beginning Friday, March 6, 2015. Rhonda was again out of town for a National Guard drill. Ethan's school had an overnight "lock-in" that Friday, and Ethan wanted to attend. Taylor wanted to stay in Prague to work on his homework at school, because the school had Internet access and Dean did not.

Taylor sent Dean a text message notifying him that Ethan would attend the lock-in and that Taylor would pick Ethan up Saturday morning after the lock-in and proceed to Dean's house. Thereafter, Dean sent Rhonda an e-mail, expressing his frustration about the lack of communication from her regarding the lock-in.

### (f) March 20 and 21, 2015

Dean was supposed to have parenting time over the weekend beginning Friday, March 20, 2015. Earlier in the week, Taylor sent Dean several text messages expressing his desire to stay in Prague to attend an alumni basketball game at school that Friday night. The messages also informed Dean about Taylor's new landscaping job in Seward, which began that Saturday, and about his preference to carpool to Seward that day with two other boys. Dean essentially told Taylor that his proposal was not acceptable. Text messages show that Taylor urged Dean to reconsider, but that Dean told Taylor that he would see both boys "Friday at 5." Taylor continued

to plead, but Dean stood firm. Taylor ultimately told Dean via text on Friday at 11:59 a.m. that he would not go with Dean that evening.

Rhonda testified that she became aware of the disagreement between Taylor and Dean when she received a text message from Dean telling her that she should have Taylor read the divorce decree. According to Rhonda, he also told her to remind the boys that he would be picking them up on Friday at 5 p.m. Rhonda testified that she told Ethan and Taylor that Dean had "the parental decision during his parenting time and they really need to work out an arrangement with [him]."

On Friday, Dean drove to Rhonda's home to retrieve the boys, but they did not get in his car. Rhonda testified that the boys' bags were packed and that they took the bags outside with them and talked to Dean for 10 to 15 minutes before returning to the house. Rhonda testified that Dean was "almost all the way down the lane" before the boys even got back to the front door. According to Rhonda, she asked the boys what was going on and they told her that Dean said they could go to the basketball game and that Ethan would need to be in Seward on Saturday when Taylor got off work so that the boys could leave for Dean's house from Seward. In accordance with this plan, the boys went to Dean's house after Taylor was done working in Seward.

## 2. DISTRICT COURT'S FINDINGS

At the conclusion of the evidence on June 11, 2015, the district court ordered Rhonda to appear on June 17, requesting that the two minor children appear at that time as well. On June 17, the parties appeared with Taylor and Ethan, and the district court orally announced its findings and decision. It found Rhonda in contempt of court for willful failure to comply with the district court's order "with regard to parenting time." The district court addressed the boys:

> I want you gentlemen to understand that it is the court's
> order, not your parents' order that you are going to be

— or that your parents are abiding by. And the consequence falls on your parents if there is a failure to comply, so I want you to know that while you think you are of an age where you can make these decisions or should be able to make these decisions, you're not yet.

The district court's June 17 order stated:

[Rhonda] is found beyond a reasonable doubt to be in willful contempt of the order of this court regarding parenting time for [Dean]. [Rhonda] is also forcibly and intentionally placing the children of the parties in the middle. Then she is using passive aggressive techniques to abrogate her obligations as the custodial parent. The court finds that modification of the parenting plan is required.

The district court did not cite to any testimony or evidence in support of its findings.

Although neither party applied for a modification, the district court made three modifications to the parenting plan. First, the district court modified the commencement of Dean's parenting time to 6 p.m. Second, the transportation arrangements were modified so that Rhonda was required to deliver the boys to Dean's home and Dean was to return them to Rhonda's home. The order also stated:

In the event that either child has a sporting event on the Friday evening on which a parenting time is to commence, [Rhonda] shall deliver the children no later than two hours following the conclusion of the event. If [Dean] is in attendance at the sporting event, the exchange may take place at the sporting event. If for any reason either of the children does not go with [Dean] from the sporting event, it shall remain the obligation of [Rhonda] to deliver the children to [Dean's] home within two hours of the completion of the event.

Third, the district court appointed a guardian ad litem for the children and ordered, "No parenting time shall be changed in any way without written consent of the guardian ad litem."

The district court committed Rhonda to jail for 60 days, but suspended the sentence and allowed for her to purge herself of the contempt so long as she (1) complied in full with all the terms of the parenting plan as modified and (2) paid $500 of Dean's attorney fees.

## III. ASSIGNMENTS OF ERROR

Rhonda assigns that the district court erred in (1) finding and holding Rhonda in contempt, (2) sanctioning Rhonda, (3) modifying the parenting plan, and (4) requiring the parties to obtain written consent of the guardian ad litem before changing the parenting schedule.

## IV. STANDARD OF REVIEW

[1] In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed is reviewed for abuse of discretion. *In re Interest of Zachary D. & Alexander D.*, 289 Neb. 763, 857 N.W.2d 323 (2015). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Rhoades v. Rhoades*, 258 Neb. 721, 605 N.W.2d 454 (2000).

## V. ANALYSIS

### 1. Contempt Finding

Rhonda assigns that the district court erred in finding her in contempt "with regard to parenting time," because there was no evidence that she willfully refused to allow Dean to have parenting time. Instead, she claims that Dean voluntarily left

without the children and that she cannot be blamed for his failure to exercise his full allotment of parenting time.

[2-4] Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party fails to comply with a court order made for the benefit of the opposing party. See, *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012); *Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 661, 782 N.W.2d 848 (2010), *disapproved on other grounds, Hossaini v. Vaelizadeh, supra*. Willful disobedience is an essential element of contempt; "willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Hossaini v. Vaelizadeh, supra*. Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence. See, *id.*; *Smeal Fire Apparatus Co. v. Kreikemeier, supra*.

Dean filed a motion for an order for Rhonda to show cause why she should not be held in contempt for her alleged failure to allow Dean to exercise parenting time with the parties' minor children during the time periods summarized in the background section above. Rhonda did not dispute that Dean was not able to exercise his court-ordered parenting time, but contended that she was not responsible for Dean's missed parenting time.

In order to show Rhonda was responsible for Dean's lack of parenting time, he cited several instances of Rhonda's transferring her responsibility as a parent to the boys. For example, he testified that on December 12, 2014, the boys initially came out to his vehicle but that Taylor returned to Rhonda's residence and spoke with her. According to Dean, upon returning to Dean's vehicle, Taylor advised him that Rhonda had told Taylor, "'Mom says we can stay.'" Rhonda denied making this statement and claimed surprise that the children did not go with Dean. Dean testified that on December 18, Taylor texted Dean advising that he did not want to see Dean

on December 19, as scheduled. Dean forwarded the text to Rhonda who responded back, "I've encouraged them to do so, but it sounds like they told you what they want."

Dean testified that he was to have parenting time on January 23, 2015, but that prior to the scheduled parenting time, he received a text from Taylor desiring to stay with Rhonda. Dean texted Rhonda for assistance, but she did not respond to Dean. Instead, Rhonda testified she advised Taylor that "he needs to communicate with his dad and let him know because it's his dad's time and his dad has the parental decision making at that point. That I didn't have any bearing on that." On March 20, Dean was to have parenting time, but before the scheduled parenting time, he received text messages from Taylor expressing that he did not want to come with Dean. Rhonda stated, "I told the boys, you know, it's your dad's time, that you need to work out an arrangement with your dad."

After the evidentiary hearing, the district court set forth its finding on the record with both parties present. It did not address each period of time that Dean alleged Rhonda had failed to allow parenting time as ordered. Rather, the district court found that overall, Rhonda had transferred her responsibility as a parent to the boys and had left it up to them to work out parenting time with Dean. This finding by the district court would also be a violation of the parenting plan, which specifically stated that Rhonda and Dean "shall be the parties solely for communicating with each other regarding parenting issues relating to the children."

In finding Rhonda in contempt, the district court chose to give greater weight to the evidence provided by Dean. Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Davidson v. Davidson*, 254 Neb. 357, 576 N.W.2d 779 (1998). Accordingly, we find no clear error in the trial court's factual findings.

As a singular event, Rhonda's allowing the boys to exercise the final decisionmaking authority in regard to Dean's parenting time may have been defensible, but the consistent pattern of her transferring her responsibility to the boys supports the finding of the trial court. Rhonda's continued behavior, coupled with the evidence that Dean was not able to exercise his court-ordered parenting time, leads to the further finding that there was no abuse of discretion by the trial court in determining Rhonda was in willful contempt for not allowing Dean parenting time as ordered.

## 2. MODIFICATION AND SANCTIONS

### (a) Modification

[5-7] Rhonda argues that it is was an abuse of discretion to require her to comply with the parenting plan as modified, because the district court had no authority to modify the parenting plan. Contempt proceedings may both compel obedience to orders and administer the remedies to which the court has found the parties to be entitled. See *Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 681, 782 N.W.2d 848 (2010). A court's continuing jurisdiction over a dissolution decree includes the power to provide equitable relief in a contempt proceeding. *Sickler v. Sickler*, 293 Neb. 521, 878 N.W.2d 549 (2016). Where a situation exists that is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation. *Strunk v. Chromy-Strunk*, 270 Neb. 917, 708 N.W.2d 821 (2006).

Further, Neb. Rev. Stat. § 42-364.15 (Reissue 2008) provides, in part:

Upon the filing of a motion which is accompanied by an affidavit stating that either parent has unreasonably withheld or interfered with the exercise of the court order *after notice* to the parent and hearing, the court shall enter such orders as are reasonably necessary to enforce rights of either parent *including the modification of previous*

*court orders* relating to parenting time, visitation, or other access.

(Emphasis supplied.)

In imposing the purge plan in the instant case, the district court stated:

I find that it is necessary to change and modify the parenting plan in order to facilitate the assurance that is necessary that there is compliance. And, therefore, beginning with the next parenting plan for [Dean], I'm going to change it so that [Rhonda] is responsible for delivering the boys to [Dean] at the beginning of the parenting plan.

The district court's statement when imposing the purge plan was an attempt to correct the situation whereby Rhonda allowed the children to determine Dean's parenting time. For example, the boys would walk out to Dean's vehicle, but refuse to leave with him and then return to Rhonda's residence. The motion to show cause gave Rhonda notice that she could be found in contempt for denying parenting time which also gave notice of a possible modification pursuant to § 42-364.15. Having given notice as required by § 42-364.15, the district court had the equitable authority, within the confines of this contempt proceeding, to modify the parenting plan as it related to issues that caused the finding of contempt. Therefore, the district court did not abuse its discretion in this regard.

### (b) Excessive Sentence

[8] Next, Rhonda challenges the imposition of the 60-day jail sentence as excessive. She argues that the sanction is unjust and has no rational relationship to her actions. In civil contempt cases involving the use of incarceration as a coercive measure, a court may impose a determinate sentence only if it includes a purge clause that continues so long as the contemnor is imprisoned. *Sickler v. Sickler, supra*. A civil sanction is coercive and remedial; the contemnors carry the keys

of their jail cells in their own pockets, because the sentence is conditioned upon continued noncompliance and is subject to mitigation through compliance. *Id*. In this instance, the district court's order stayed the execution of the jail sentence and allowed Rhonda to fully purge herself of the contempt order by complying with the purge plan. Accordingly, the jail sentence was coercive rather than punitive, and the district court did not exceed its authority or abuse its discretion by imposing it.

### (c) Guardian Ad Litem

Lastly, Rhonda assigns that the district court erred by requiring the parties to obtain written consent of the guardian ad litem before changing the parenting schedule. She cites *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980), *disapproved on other grounds, Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002), to support her position that requiring approval of a guardian ad litem prior to any change in the parenting plan was an unlawful delegation of the district court's duties. In *Deacon*, the appellant claimed that by the terms of the trial court's order, a psychologist had been given "the last word" on whether any visitation would occur. 207 Neb. at 199, 297 N.W.2d at 761. We stated:

> [T]hat portion of the trial court's order placing in a psychologist the authority to effectively determine visitation, and to control the extent and time of such visitation, is not the intent of the law and is an unlawful delegation of the trial court's duty. Such delegation could result in the denial of proper visitation rights of the noncustodial parent.

*Id*. at 200, 297 N.W.2d at 762. However, *Deacon* is distinguishable, because the order in that case delegated to a third party the authority to determine when and if a parent could exercise parenting time. In the present contempt action, the guardian ad litem may only consent to a change in parenting time; the authority to determine parenting time for either

party remains with the district court. Under the district court's order, the parties may not deviate from the current court-ordered parenting plan without the district court's ultimate approval. This provision by the trial court was within its equitable powers to devise a remedy in a contempt action to address a continuing issue involving the children. See *Strunk v. Chromy-Strunk*, 270 Neb. 917, 708 N.W.2d 821 (2006). Accordingly, the district court did not err in requiring the parties to obtain written consent of the guardian ad litem before changing the parenting time schedule.

## VI. CONCLUSION

We hold that the district court did not commit clear error in its factual findings and did not abuse its discretion in finding Rhonda in contempt or in imposing the 60-day jail sentence. Further, the district court did not abuse its discretion in modifying the parenting plan, within this contempt proceeding, to devise an equitable remedy to address a continuing issue involving the children.

Affirmed.